UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

THE UNITED STATES OF AMERICA,

  -against-

                              22 Cr. 132 (LJL)

Moorishyu Bey

               Defendant

---

## SENTENCING MEMORANDUM ON BEHALF OF MOORISHYU BEY

---

Susan G. Kellman, Esq.
Attorney at Law
25 Eighth Avenue
Brooklyn, NY 11217
718-783-8200
sgk@kellmanesq.com
Attorney for Moorishyu Bey

Chris La Tronica, Esq.
Attorney at Law
34 N. 7th Street
Brooklyn, NY 11249
(347) 973 2992
cmlatronica.law@gmail.com
Attorney for Moorishyu Bey

## BACKGROUND

Growing up in the Bronx in the 1980's and 1990's was like few places on Earth. African American and Hispanic boys didn't have to fall into the trap that was either gangs, drugs, or violence—the Bronx had them all! So many, though not all, ended up in jail or worse—dead. The Bronx meant no job opportunities; police outposts on school grounds; getting beaten or high on crack on the walk to school; shop keepers fleeing. In those days, the Bronx was often described as a "war zone"— murder rates soared to all-time highs.[1]

Moorishyu Bey began his life journey against this backdrop. Few that walked this path had the tenacity, means, support, skills or education to get out of the Bronx and create a life that comes so easily to those more fortunate. Moorishyu was no exception. At the time of his birth, Moorishyu's mother was addicted to crack cocaine—an addiction she continues to deny to this day. Not only did this birthright expose him to the associated health and development issues, but it left him without any support system and adult guidance for almost his entire life.

During his early childhood, Moorishyu's father was the custodial parent, his mother's addiction making it impossible for her to care for her family. His father's lack of interest in raising a child, however, placed Moorishyu's paternal grandmother in the role of primary caregiver from his infancy until the age of four. Given his age, Moorishyu does not remember much from this period. Moorishyu

---

[1] Department of Justice, Bureau of Justice Statistics analysis, *U.S. Homicide Rate Falls to Lowest Rate in Four Decades* (November 18, 2011) https://www.justice.gov/archives/opa/blog/new-report-us-homicide-rate-falls-lowest-rate-four-decades.

explains that his first memory is of his grandmother's death when he was 4 years old. "I witnessed it. She vomited and fell to the floor. I was there with her until an uncle found us. He came by after not hearing from my grandmother for a period of time." He could not recall how long we was alone with his grandmother after she passed away.

In the aftermath of his grandmother's death, the adults in Moorishyu's life, unwilling to undertake the responsibilities of parenting a young child, sent him back to live with his mother. Still addicted to drugs, he remembers his mother's apartment as chaotic. Physical violence was the "go-to" solution for all problems – and money was commandeered to crack before food. The addition of two stepsisters to his family meant that the food stamps that had once put food on the table, was more often than not – insufficient to feed the young family until the next installment arrived. Moorishyu grew up terrified and hungry. He remained in this environment until the day his younger brother was born with crack cocaine in his system.

It was at this point that whatever safeguards the "system" had in place to protect children could no longer mask his mother's addiction. It was at this point, at the age of six, that Moorishyu's journey took him (and his siblings) into the foster care system; where, after living with at least five different families that he can recall, he struggled for survival until the age of fifteen. Moorishyu remembers the best of the placements was with an older couple. He recalled that he was a means to an end for them because they were able to "collect a check" and they were his meal

ticket, which, sadly, was a step up for him. The worst of the foster parents subjected

him to physical abuse and discipline in the form of depriving him of food.

Unsurprisingly, by the age of 11, the continuous abuse Moorishyu endured on a

daily basis since birth, qualified him for admission into a Residential Treatment

Center ("RTC"), for his own protection. There, Moorishyu began to thrive. He was

able to attend school, receive counseling and mental health services – all of which

was accompanied by appropriate adult supervision.

Had Moorishyu's journey kept him in this safe and nurturing environment, it

is possible that he might never have faced judgment by this Court. Unfortunately,

at the age of fifteen the foster care system inexplicably returned Moorishyu to his

mother. Time and time again, we hear of young African American boys falling into

the trap of the projects – gangs, drugs, and crime. In Moorishyu's case, the decision

to return him to his mother was the equivalent of pushing him deeper into a world

that began to feel inescapable. Moorishyu confides, "being with my mother meant

surviving on the streets." Sadly, Moorishyu became just another statistic—rather

than the exception.

We respectfully submit that Moorishyu Bey hopes that your Honor will give

him a chance to make his wrongs—right. We pray that a closer examination of his

ability to thrive in a supportive environment in conjunction with a generous

application of 18 U.S.C. Section 3553(a), will lead your Honor to conclude that a

below-Guideline sentence is "sufficient but not greater than necessary" to satisfy the

goals of sentencing.

<u>Objection to the Guideline Calculation</u>

Moorishyu Bey pled guilty, without the benefit of a plea agreement, to the sole count in the indictment, charging him with being a felon in possession of a firearm, on October 10, 2022. Moorishyu is scheduled to be sentenced by this Honorable Court on January 11, 2023. Section 922(g)(1) carries a maximum term of imprisonment of ten years; a maximum term of supervised release of three years; a maximum fine of $250,000; and a mandatory $100 special assessment.

Relying on the attempted murder Guideline (U.S.S.G. Section 2A2.1(a)(1)(A)), the Presentence Investigation Report ("PSR") determined that the proper Base Offense Level ("BOL") should be 33, yielding a Sentencing Guidelines range of 168 – 210 months, capped, of course, by a statutory maximum of ten years. Probation finds that the object of the offense would have constituted first degree murder and Moorishyu's actions, therefore, constituted an "attempt." We respectfully submit that this application of the murder Guideline is incorrect since a person is guilty of murder when, "[w]ith intent to cause the death of another person, he causes the death of such person or of a third person." (Penal Law § 125.25 [1]). There is no indicia Moorishyu intended to cause the victim's death, and Moorishyu's actions were not premeditated. No reasonable view of the evidence could establish *attempted murder*.

Rather than using the Guideline calculation set forth in the PSR, we respectfully ask that your Honor consider using the *aggravated assault* guideline, U.S.S.G. § 2A2.2 and adopt the applicable offense level that comports with the offense charged in the indictment. Pursuant to U.S.S.G. § 2K2.1(c)(1)(A), because

the defendant used or possessed the firearm in connection with the commission of another offense, to wit, aggravated assault, § 2A2.2 is applied with respect to that other offense, if the resulting offense level is greater than that determined under § 2K2.1(a)-(b). As discussed below, the total offense level of **21** under § 2A2.2 should apply. The facts surrounding the shooting strongly support a finding by this Court that Moorishyu fired at the apartment door while in a state of extreme agitation following the savage beating of his friend and the taunting he received from inside the apartment.

Under 2K2.1(a)-(b), **18** is the total offense level. As outlined in the government's *Pimentel* letter of 14 September 2022, the base offense level is 14 because, pursuant to § 2K2.1(a)(6), Moorishyu was a prohibited person at the time he committed the instant offense. (*Pimentel* letter, at 1, annexed as Exhibit A.) This base offense level increases by 4, pursuant to § 2K2.1(b)(6), because Moorishyu used or possessed a firearm or ammunition in connection with another felony offense, to wit, *aggravated assault*.

Turning to the aggravated assault guideline § 2A2.2, the total offense level is **21**. Pursuant to § § 2A2.2(a), the base offense level is **14**. This increases by **2**, pursuant to § 2A2.2(b)(1), because the assault involved more than minimal planning. A **5**-level increase is also required, pursuant to § 2A2.2(b)(2), because a firearm was discharged in the course of the assault. Accordingly, § 2A2.2 applies because the resulting offense level is greater than that determined under § 2K2.1(a)-(b).

Moorishyu takes full responsibility for his unlawful conduct; however, we respectfully submit that the more appropriate way to calculate the proper Guideline for his conduct is as follows:

U.S.S.G. Section 2A2.2

| | | |
|---|---|---|
| • Base Offense Level | | 21 |
| • Impeding Justice | + | 2 |
| • Acceptance of Responsibility | - | 3 |
| • Total Offense Level | | 20 |
| • Guideline Range (w/CHC III) | 41 — | 51 |

## Sentencing Considerations

The Supreme Court has held a sentencing judge is to "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Pepper v. United States,* 562 U.S. 476, 487 (2011) (quoting *Koon v. United* States, 518 U.S. 81, 113 (1996)). While the guidelines are the "starting point and the initial benchmark," the judge "may not presume that the Guidelines range is reasonable." *Gall v. United States,* 552 U.S. 38, 39 (2007). Rather, district courts are required to make an "individualized assessment" of the sentence warranted "based on the facts presented." *Id.* at 39.

Section 3553(a) of Title 18 provides that "[t]he court shall in every case impose a sentence sufficient, but not greater than necessary to comply with the purposes set out in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). Among the factors to be considered at sentencing are: (1) the nature and circumstances of

the offense, (2) the history and characteristics of the defendant, and (3) "the need for the sentence imposed—(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; [and] (C) to protect the public from future crimes of the defendant." 18 U.S.C. § 3553(a). We pray that your Honor will agree that several factors warrant the Court's leniency here.

<u>Nature and Circumstances of the Offense Conduct</u>

The seriousness of Moorishyu's offense is clear. He entered a guilty plea to firing a single shot recklessly into a door of an apartment on the fourth floor of a building located in the Bronx, on February 3, 2020. Just prior to the shooting, a group of six to seven individuals were involved in a vicious assault that seriously injured Moorishyu's close friend, on the first floor of the same building. Leading up to that day, this group had continuously bullied Moorishyu's friend. This bullying culminated in the group recording themselves as one among them attacked her in the hallway on the first floor of her apartment building. Moorishyu's friend reached out to him several days before this incident and through her tears let him know that she was being attacked by a group of people in her building. Unable to protect herself from these attacks – because calling the police raised more problems than it solved – she reached out to Moorishyu and asked for his help.

In the course of this final assault, Moorishyu's friend was savagely beaten. Her head is slammed against a wall twice. The slams are so forceful that a male member of the bullying group cried out in shock. Dazed, Moorishyu's friend

collapses to the floor. Her assailant continued punching her in the head and face, dragged her across the hallway by her hair, and pinned her to the floor, as the beating continued. At some point during this savage beating, even the group of bullies cried out for the assailant to stop. The brutal assault continued, as she was punched in her head and face. Eventually,  her heretofore assailants attempt to pry the assailant off of Moorishyu's friend. At the end of the video Moorishyu can be seen entering the hallway carrying a gun. The only people standing in the hallway are the bulling group. Moorishyu's friend is lying motionless on the floor. Her assailant stands over her, refusing to stop. The video ends with Moorishyu firing a single shot over the heads of those in the bullying group—causing them to run out of the building, thus ending the attack.

Next, Moorishyu heads to the fourth floor of the building to an apartment he know is associated with the bullying group. A camera in the hallway captures Moorishyu pacing back and forth in the hallway outside the apartment. Moorishyu can be seen yelling at a specific apartment for over seven minutes. He yells to leave his friend alone; insisting that they stop attacking her. Moorishyu confided that this experience took him back to his childhood—specifically the times that he and his siblings were savagely beaten by any number of his mother's crackhead associates. In response to Moorishyu, occupants of the apartment yelled back in Spanish, a language that he did not understand. In that moment, all he did understand was that in response to his demand to stop hurting his friend individuals associated with the bullying group repeatedly yelled back at him.

Moorishyu remembered feeling shame at not being able to protect those closest to him. Images of his friend being savagely beaten comingled with memories of what he and his siblings were forced to endure growing up. An emotional timebomb swirled in his mind, triggered by the instinct to protect his loved ones. With the bullies hiding in the apartment, Moorishyu's emotions erupted and he fired a single shot through the apartment door. After the shot, Moorishyu continued yelling at the inhabitants inside the apartment for approximately two additional minutes. Despite the fact that no one was injured, he recognizes that his actions are inexcusable.

<u>Who Is Moorishyu Bey – History and Characteristics</u>

First and foremost, Moorishyu is a parent to two wonderful children; and, he is committed to being the kind of parent to his son and daughter that he wished he had growing up. Prior to his arrest in connection with this incident, he was involved in both their lives. He worked hard to provide them the love, support, and safety he never had growing up. Following his state arrest for the instant offense, Moorishyu was released on bail. Upon his release from Riker's Island, his first thought was for his children. Almost immediately, Moorishyu went to Chicago to prevent his daughter from being placed in a group home. Moorishyu would do anything to spare his own children the childhood he endured. His daughter, now 17 years-old, lived with him until the end of 2021, when he learned there was a warrant for his arrest, and he sent her to live with his sister in Colorado. As for his son, now 10 years-old,

Moorishyu knew he was safe with his maternal grandmother in Connecticut, where he visited him often over the previous two years.

Because of his current circumstances, he is attempting to shield his children from knowing too much. Given the sacrifice his extended family is making by helping him to raise his children, Moorishyu elected to not burden them with the additional task of writing your Honor a letter. Instead, he hopes the fact that these family members are willing to support his children speaks for itself. While Moorishyu is far from a perfect father, his parenting ability should be weighed against the parental figures (or lack thereof) in his life, and his sincere desire to do a better job than his parents did.

Moorishyu spent his first nine years just praying he'd survive. His mother's addiction, his father's absence, and the dysfunction of the New York child welfare system all conspired against the efforts of this young boy. When he entered foster care at the age of six, his first foster parents subjected him to physical abuse. Fists. Belts. Any object that could be hurled in his direction. Moorishyu quickly learned the method did not matter. The bruises and welts always hurt regardless of the weapon du jour. Eventually he learned that acting out in response to the physical abuse earned him more brutal discipline in the form of withholding food. The survival instinct he honed living with his mother, both before and after his foster care placements, allowed him to quickly learn to take the abuse in order to receive food and to maintain some semblance of normalcy. This is a lot for an 8-year old. Fortunately, at the age of eight, the New York City Administration for Children's

Services ("NYC ACS") removed Moorishyu from this foster placement. Unfortunately, it took NYC ACS over two years to do so.

His next foster parents were a monumental improvement. Rather than focus their attention on him in the form of constant abuse, they simply ignored him. For better or worse, this couple was content to simply warehouse him in their apartment and collect the associated fee. Of course, they had the advantage of being adults – while Moorishyu was only eight years old. At first, Moorishyu was grateful to have parental figures providing consistent food without any beatings. However, a child needs more than nutrition to flourish. The lack of love took its toll on eight-year-old Moorishyu. "They didn't have to love us, they only had to put a roof over our heads" he recalls. The absence of this necessary emotional support caused him to have trouble adjusting to his fourth family. Eventually, the money Moorishyu brought in no longer outweighed the burden of his demands for emotional support and he was sent to his first RTC.

Green Chimneys RTC provides animal-assisted therapy and educational activities for children with special needs. Animal-assisted therapy is designed to help with academic deficiencies, difficult personal histories, and other perceived life challenges. It accomplishes this by creating an environment that places children in situations that require teamwork, regulation of emotions, and conceptual thinking to solve problems. Moorishyu related an example of this therapy in action, "no horse is going to let you clean its hoof if it doesn't want to. You can't force them. You have to show them they can trust you."

Green Chimneys is located on a farm and wildlife center in Brewster, NY. Moorishyu lived there from the age of 9 to 13. When asked about this experience there is a noticeable change in Moorishyu's affect—a visible manifestation of the lasting impact treatment had on his development. There Moorishyu excelled in the animal program, which teaches children how to interact with others in a respectful manner and eventually to care for others. Remarkably, Moorishyu excelled in horsemanship, which required him to be responsible for the care and maintenance of his horse and other barnyard animals. He also participated in competitive English Riding events such as jumping. Based on his skill with the animals, Moorishyu was given increasing caretaking responsibilities. The joy he felt when describing his experience with the horse – so many years later – was palpable.

Reflecting on his time there, Moorishyu talks about learning to work as part of a larger community. In addition to taking care of the animals, he also had cooking and cleaning responsibilities. He explained that everyone did – which is what made it a community. The structure at Green Chimneys helped Moorishyu excel in school as well. Based on the progress made, Moorishyu graduated from Green Chimneys at the age of 13. Sadly, he was returned to foster care. His new placement was unremarkable. However, because it lacked the structure he needed to excel, after a year Moorishyu was sent to Graham Windham, another RTC – this time in Yonkers.

Moorishyu's experience at Graham Windham was similar to Green Chimneys. There he attended school for a year and a half, eventually earning his

diploma from Roosevelt High School in the Bronx. At Graham Windham, he benefited from the structure and treatment provided by the RTC program. Moorishyu indicated that his upbringing – the lack of stability, the emotional/physical abuse and the lack of food – caused him to experience anxiety and depression. When unchecked, these conditions limited his ability to interact with his environment in a positive way. Without treatment, Moorishyu defaulted to a defensive outlook in an attempt to minimize the impact of negative developments in his life. He explained that while at Graham Windham, he began to develop the tools necessary to engage with his mental health issues in a positive way. There he received regular individualized counseling/therapy aimed at teaching him how to manage his emotions and redirect them into positive coping mechanisms designed to address the sources of stress in his life. However, his progress stalled when, at the age of 15, he was inexplicably returned to his mother's "care."

This change was the equivalent of pulling the emergency brake on Moorishyu's rehabilitation. He explained to counsel that his return to his mother, didn't just stop his progress, it derailed it. Back with his mother, who continued to mask her addiction – to the extent possible, Moorishyu was left to survive on the streets. Given his age, he could no longer rely on NYC ACS to find him placements in a home able to provide him with the basics – like food. Instead, Moorishyu turned to people also living in the streets to learn how to make enough money to feed himself. Relying primarily on low level "street scams," Moorishyu began a pattern that kept him alive but bouncing back and forth between periods of incarceration.

This corresponds approximately to the beginning of his adult criminal history in October 2000.

For all of his twenties, Moorishyu was involved in criminal conduct primarily related to "Fraudulent Accosting."[2] Moorishyu engaged in this behavior because it was the only way he knew to buy his next meal. At some point during this period his mother was evicted from her apartment. Moorishyu indicates that this had no discernable impact on his life because he never really slept in her apartment. Eventually Moorishyu was charged with an assault that resulted in three years of upstate incarceration. He describes this time as difficult given the violence inherent in the New York Prison System. He reports that the gangs in these institutions would regularly attack him because he was not affiliated with any group. Moorishyu survived by keeping to himself. While incarcerated, he completed over two hundred and forty hours of academic education courses. In addition, he worked as a porter, a light fixture technician, a mason, and a painter. Moorishyu also took advantage of therapeutic programing offered by the New York Department of Corrections—participating in regular therapy and completing an aggression replacement training program.[3]

When Moorishyu was paroled in September 2010, it was the beginning of the end of his criminal career, though it lingered until 2016, when he was convicted,

---

[2] Under New York Law, a person is guilty of Fraudulent Accosting when that person accosts another person in a public place with intent to defraud such person of money or property by means of a trick, swindle or confidence game. N.Y. Courts, FRAUDULENT ACCOSTING, https://www.nycourts.gov/judges/cji/2-PenalLaw/165/165-30%281%29.pdf

[3] It is impossible not to notice that his periods of successful living coincide, in every instance, with a structured environment and emotional support – and food.

once again, for fraudulent accosting. This last conviction came at the age of 33. At about this time Moorishyu was introduced to the Moorish Science Temple of America. The sense of community connected with the Temple is what initially drew Moorishyu to want to join. Moorishyu remembers that following his release from incarceration a friend gave him a copy of the Moorish Qur'an. He was intrigued to learn that the Qur'an included the story of Jesus' life from birth to eighteen years of age. Moorishyu relates, "Jesus Christ had to overcome an extremely difficult childhood. He went through a lot of things that children should not have to experience. But these experiences made him the person he became as an adult. Because he knew pain and suffering, he was able to relate to and save those in pain and suffering." Moorishyu saw similarities between the struggles Jesus endured as a child and his own. Knowing this strengthened his belief that he could also overcome his own childhood and gave him renewed faith in himself through his participation in the Temple.

At Temple, Moorishyu met Siraj Bey—his current "common-law" partner. Recalling her initial impression of him, Ms. Bey writes "Moorishyu is a very kind, soft spoken person and he has a big heart. The things I have come to know that are important to him are family, education, health and growth." (Siraj Bey Letter, at 1, annexed as Exhibit B.) The Moorishyu described in her letter stands in stark contrast to the Moorishyu on display in February 2020. Even Moorishyu has difficulty reconciling these two versions of himself. He is resistant to the idea that his upbringing played a substantial role in this duality. He is not willing to accept

the profound effect the abuse he endured has had over his current situation.
Moorishyu explains that he refuses to accept this because he is not willing to stop
believing that he can overcome his trauma.

### Moorishyu's Acceptance of Responsibility and Future Plans

What Moorishyu does accept is full responsibility for his criminal conduct. He
has learned many lessons during the course of this case and has taken these lessons
to heart. Moorishyu regrets the actions that led to his arrest. He is remorseful for
the people he has scared and hurt and the damage he has caused. His primary focus
is on taking responsibility for the instant offense and completing his sentence in a
way that positions him to re-engage with his children as soon as possible.

Counsel has observed that Moorishyu's main concern is preventing his
children from experiencing the pain and abuse that he lived with during his young
life. More than that, he prays that they will not follow his path. This is why when
he became aware that his daughter was at risk of being placed in a group home, the
first thing he did when he was released on bail, was to get his daughter to Colorado
where his sister now acts as her custodial parent. He could not stand the thought of
her going through the same system that exposed him to so many traumas. At his
sister's home he believes that she will be in a safe and supportive environment –
while he deals with the charges related to the instant offense.

Moorishyu deeply regrets losing this time with his children and regrets every
minute that passes him by. Moorishyu shared with counsel his willingness to work
hard to become the person he needs to be—if only for his children's sake—which is

worthy of the Court's favorable consideration. He has expressed his resolve to never again cause his children the pain that they have experienced over the past three years.

Moorishyu is ready to become his best self and reintegrate as a productive member of society. He is ready, willing, and able to lead a law-abiding life. Though he is not the cut-and-paste antagonist the government portrays him to be, Moorishyu recognizes that the actions he took, that resulted in the pending charges, are serious. But his story does not have to be perpetually bound to criminal conduct. Moorishyu believes that he is capable of profound growth – as a man, as a father, and as a functioning member of his community. His confidence is bolstered by the love and support he feels from his Temple and his children. Counsel shared the story of Moorishyu's early life, not for sympathy; rather, to contextualize the events that shaped him and the hardships he has endeavored to overcome.

Moorishyu aspires to regain his freedom and feels like he is ready to take control of his life. His time at the MDC has been sobering and he feels ready to embrace the next chapter of his life – confident that he never wants to find himself in federal custody again. He hopes that upon his release, he will be able to make a fresh start. Moorishyu is determined to be a productive member of society and to set a better example for his children. Moorishyu intends to devote himself to his children and the Temple. He plans to live with his partner Siraj and find employment in the area that permits him to play an active role in his children's lives. Moorishyu also hopes to be able to volunteer and speak to young men in his

community about how to avoid the mistakes he made when he was their age. Perhaps he can help other young men to "jump onto the right track." Moorishyu is hopeful that, upon his release to supervision, he will be able to rely on his connection to the Temple in addition to the support of probation to make this a reality.

### Incarceration During the Covid-19 Pandemic

Moorishyu arrived at MDC in April of 2022, with approximately 1,700 other incarcerated individuals. Many, including Moorishyu, share small two-person cells originally designed for one person, with a shared toilet and sink. Throughout the pandemic, MDC has continued to "double-cell" its incarcerated population. Other inmates are confined in large, dormitory style settings with as many as 70 people sharing a sleeping space and beds spaced only 3 to 5 feet apart. Since the onset of the COVID-19 pandemic, the facility has cycled in and out of full lockdown. At first, detainees were let out of their cells for 15-20 minutes every other day to shower – though this schedule did not include weekends – when showers were not permitted. Inmates at MDC were locked in a never-ending confinement with no access to programming and severely limited access to medical care, personal hygiene, family or even counsel. Throughout the pandemic, the "panic" buttons in each cell were disabled, making it impossible to call for help in emergencies. While restrictions had begun to relax to some extent as Covid wanes, the relief was short-lived – given the gang violence that permeates every unit at MDC. In-person visits with family and counsel were suspended, and even today, are severely limited – particularly in

light of the recent violent flare ups that now regularly result in institution-wide

lockdowns. During lockdowns, the only drinking water available to inmates is from

the faucet in their cells, which runs brown/rusty in many of the units, including

Moorishyu's. For reasons that have never been satisfactorily explained, cleaning

supplies were removed from all MDC units throughout most of the pandemic,

making it impossible for prisoners to attempt to keep their own units and

individual cells clean. The response to this simple inquiry includes a chorus of –

inmates can purchase their own soap and hygiene supplies from the commissary;

however, that assumes they can afford the same.

The constant lockdowns at MDC have exhausted Moorishyu Bey –

emotionally and physically. Constant lockdowns and isolation severely impacted the

inmates – which leads to frequent and escalating violence. Inmates and staff at the

MDC – many of whom have refused to be vaccinated or even wear a mask – have

become infected with the virus. Connections with loved ones have dwindled, due to

lack of access to phones and in-person visits. Cooked meals are a virtual memory, as

Covid has resulted in kid-sized lunch boxes, filled with white bread and bologna, PB

& J and a bottle of water. These boxes are being thrown into the housing units by

unvaccinated and unmasked guards. The reality is that the constant lockdowns

have virtually eliminated commissary shopping. Additionally, it appears that the

prison personnel has just given up – inmates are being housed in units run by gang

members, which has led to an extraordinary number of violent incidents – and more

lockdowns. And, in case life at the MDC wasn't sufficiently tragic, one cannot finish

this chapter without acknowledging the negative impact that the closing of the MCC has had on the already catastrophic overcrowding and additional gang violence.

While incarcerated at the MDC, Moorishyu has had his ups and downs, in a facility where constant violent outbreaks leading to lockdowns, or placement in the "segregated housing unit" aka the "SHU", is just another day. Coursework during this time has been extremely limited. The lockdowns, whether attributable Covid or unhinged violence has drastically limited programing; and for that matter, any semblance of normalcy.

The only silver lining for Moorishyu is that during these inescapable months of lockdown, he has had quiet time to reflect on his life. This has helped him to realize that he never wants to be in this position again. He has had time to ponder his Qu'ran. Indeed, for the first time in his life, Moorishyu believes that a better world awaits his ultimate release.

The Sentencing Guidelines were never drafted to envision a global viral pandemic, nor the catastrophic failure of the BOP to keep detainees safe, healthy, positively motivated, and connected to their loved ones and their communities during these difficult times. Courts throughout this Circuit, however, have taken these extraordinarily onerous conditions into account when fashioning a just and fair sentence.

We respectfully ask the Court to factor the extraordinary conditions of Moorishyu's incarceration at the MDC into its sentencing calculus.

### The Purposes of Sentencing are Satisfied by a Below Guidelines Sentence

We hope that your Honor will reject the PSR's version of the Guideline range and adopt the Guideline range set forth hereinabove, finding that the defense's version of the appropriate Guideline is the one associated with an "aggravated assault" rather than employing the "murder" Guideline. Applying the Guidelines associated with an "aggravated assault" results in a Guideline range of 41-51 months, rather than 168 – 210 months, as contemplated in the PSR. In either case, however, the advisory range should not be followed because it: (1) is far greater than necessary to promote the goals of sentencing; (2) is out of balance with the purposes of sentencing, and fails to give due consideration to all of the factors set forth in 18 U.S.C. § 3553(a); (3) is the product of a Guideline system that is not based on empirical data; and (4) utterly fails to fully take into account the extreme conditions of confinement that Moorishyu Bey has had to endure at MDC.

Moorishyu Bey's personal circumstances, and his commitment to turning his life around, all support the imposition of a below Guidelines sentence. Extended incarceration is not necessary to accomplish the purposes of sentencing and, in our respectful view would violate the mandate of § 3553(a) that the Court impose a sentence sufficient, but not greater than necessary to achieve the purposes of sentencing.

### The Need for General and Specific Deterrence

The need to send a message of specific deterrence to Moorishyu Bey has more than been accomplished by his stay at MDC; and would not be undermined by the application of a downward variance. As Moorishyu Bey will tell the Court at

sentencing, his prayer that the lessons he has learned as a result of this arrest, have helped him to imagine all of the ways that he can – and indeed – must change his life. Moorishyu has committed himself to a lawful way of life. Facing the threat of impending death on a near daily basis since being incarcerated at MDC, has helped Moorishyu to realize that he has far too much to live for and way too much to lose to be involved in criminal activities going forward. He realizes that now – in a way that he did not appreciate before. He admits wholeheartedly that the actions he took were wrong and has taken responsibility for his actions. He hopes someday everyone he has hurt in his life will understand how profoundly sorry he is and will find it in their hearts to forgive him.

As for general deterrence, there simply is no evidence that increases in sentence length reduce crime through deterrence.[4] "Three National Academy of Science panels, ... reached that conclusion, as has every major survey of the evidence." Michael Tonry, <u>Purposes and Functions of Sentencing</u>, 34 Crime and Justice: A Review of Research 28-29 (2006)[5]; <u>see also</u> Andrew von Hirsch, et. al., <u>Criminal Deterrence and Sentence Severity: An Analysis of Recent Research</u> (1999).

---

[4] Of course, deterrence works in the sense that there is less crime with a criminal justice system then there would be without one. But the question here is one "marginal deterrence"; i.e., whether any particular quantum of punishment results in increased deterrence and thus less crime.

[5] This Article is available on Westlaw.

Moorishyu Bey has been deterred and has accepted responsibility for his conduct. We respectfully submit that nothing would be gained now by the imposition of a Guidelines sentence.

<u>Conclusion</u>

In sum, consideration of all the factors contained in 18 U.S.C. § 3553(a), we submit, warrants imposition of a below Guidelines sentence for Moorishyu Bey. The profile of the offender, given all the circumstances relative to him—his background, extreme familial circumstances, and the extreme conditions of confinement at the MDC, owing to the COVID-19 pandemic and the complete failure of the institution to provide even the basics required to sustain life, militate strongly in favor of a below Guideline sentence for Moorishyu. For the reasons set forth above, we respectfully submit that this Court should impose a below Guidelines sentence.

Dated: December 24, 2022
Brooklyn, New York

*Susan G. Kellman*
_____
Susan G. Kellman, Esq.
Attorney at Law
25 Eighth Avenue
Brooklyn, NY 11217
718-783-8200
sgk@kellmanesq.com

*Chris LT*
_____
Chris La Tronica, Esq.
Attorney at Law
34 N. 7th Street
Brooklyn, NY 11249
(347) 973 2992
cmlatronica.law@gmail.com

cc:    All Counsel
       Katherine Wysoczanski,
       USPO
       Moorishyu Bey

EXHIBIT A



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

September 14, 2022

**BY EMAIL**

Zawadi Baharanyi
Zawadi_Baharanyi@fd.org

 Re: **United States v. Moorishyu Bey, 22 Cr. 132 (LJL)**

Dear Ms. Baharanyi:

 This document is not a plea agreement.  Rather, pursuant to the suggestion of the Court in *United States v. Pimentel*, 932 F.2d 1029, 1034 (2d Cir. 1991), this letter sets forth the current position of the United States Attorney's Office for the Southern District of New York (the "Office") regarding the application of the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") to defendant Moorishyu Bey (the "defendant") in this case.

 The Indictment charges the defendant with one count of being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1), and carries a maximum term of imprisonment of 10 years, a maximum term of supervised release of three years, a maximum fine, pursuant to Title 18, United States Code, Section 3571, of $250,000, and a $100 mandatory special assessment.

 The Government currently believes that the Guidelines apply to the crime charged in the Indictment as follows:

A. Offense Level

 1. The applicable Guidelines manual is the November 1, 2021 edition.

 2. The Guideline applicable to the offense charged in Count One is U.S.S.G. § 2K2.1.

 3. Pursuant to § 2K2.1(a)(6), the base offense level is 14 because the defendant was a prohibited person at the time the defendant committed the instant offense.

 4. Pursuant to § 2K2.1(b)(6), the base offense level increases by 4 because the defendant used or possessed any firearm or ammunition in connection with another felony offense, to wit, attempted murder.

 5. Pursuant to § 2K2.1(c), because the defendant used or possessed a firearm cited in the offense of conviction in connection with the commission or attempted commission of

04.09.2018

another offense, to wit, attempted murder, § 2X1.1 applies because the resulting offense level for attempted murder under § 2A2.1 is greater than that under § 2K2.1.

6. Pursuant to U.S.S.G. § 2A2.1(a)(2), the base offense level is 33 because the object of the offense would have constituted first degree murder.

7. Pursuant to U.S.S.G. § 3C1.1, the base offense level increases by 2 because the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to the defendant's offense of conviction and any relevant conduct, to wit, the defendant willfully failed to appear for proceedings in Bronx Criminal Court related to the instant offense of conviction beginning in February 2022 and remained a fugitive from state and federal authorities until his arrest by federal law enforcement approximately two months later on April 15, 2022.[1]

8. Assuming the defendant clearly demonstrates acceptance of responsibility, to the satisfaction of the Government, through his allocution and subsequent conduct prior to the imposition of sentence, a two-level reduction will be warranted, pursuant to U.S.S.G. § 3E1.1(a).

In accordance with the above, the applicable offense level for Count One is 33.

B. Criminal History Category

Based upon the information now available to this Office, the defendant has 5 criminal history points, calculated as follows:

1. On or about August 29, 2016, the defendant was convicted in New York County Criminal Court for fraudulent accosting, in violation of N.Y.P.L. § 165.30, a misdemeanor, and was sentenced to a conditional discharge. Pursuant to U.S.S.G. § 4A1.1(c), this conviction results in one criminal history point.

2. On or about July 13, 2011, the defendant was convicted in New York County Criminal Court for fraudulent accosting, in violation of N.Y.P.L. § 165.30, a misdemeanor, and was sentenced to 10 days' imprisonment. Pursuant to U.S.S.G. § 4A1.1(c), this conviction results in one criminal history point.

3. On or about December 3, 2008, the defendant was convicted in New York County Criminal Court for Assault with Intent to Cause Physical Injury to an

---

[1] On or about February 21, 2020, a grand jury sitting in the Bronx returned a 37-count indictment charging the defendant, among other things, with attempted murder in the second degree for his commission of the shooting on February 3, 2020 that is the basis of the instant offense of conviction.

Officer/Fireman/EMT, in violation of N.Y.P.L. § 120.05(3), a felony, and was sentenced to 3 years' imprisonment. Pursuant to U.S.S.G. § 4A1.1(a), this conviction results in three criminal history points.

4.  On or about September 5, 2006, the defendant was convicted in New York County Criminal Court for resisting arrest, in violation of N.Y.P.L. § 205.30, a misdemeanor, and was sentenced to 60 days' imprisonment. Pursuant to U.S.S.G. § 4A1.2(e), this conviction results in no criminal history points because it was imposed more than ten years prior to the defendant's commencement of the instant offense.

5.  On or about October 6, 2006, the defendant was convicted in New York County Criminal Court for criminal trespass, in violation of N.Y.P.L. § 140.15, a misdemeanor, and was sentenced to time served. Pursuant to U.S.S.G. § 4A1.2(e), this conviction results in no criminal history points because it was imposed more than ten years prior to the defendant's commencement of the instant offense.

6.  On or about September 30, 2004, the defendant was convicted in New York County Criminal Court for fraudulent accosting, in violation of N.Y.P.L. § 165.30, a misdemeanor, and was sentenced to 6 months' imprisonment. Pursuant to U.S.S.G. § 4A1.2(e), this conviction results in no criminal history points because it was imposed more than ten years prior to the defendant's commencement of the instant offense.

7.  On or about April 8, 2004, the defendant was convicted in New York County Criminal Court for resisting arrest, in violation of N.Y.P.L. § 205.30, a misdemeanor, and was sentenced to 45 days' imprisonment. Pursuant to U.S.S.G. § 4A1.2(e), this conviction results in no criminal history points because it was imposed more than ten years prior to the defendant's commencement of the instant offense.

8.  On or about September 25, 2003, the defendant was convicted in New York County Criminal Court for fraudulent accosting, in violation of N.Y.P.L. § 165.30, a misdemeanor, and was sentenced to 7 days' imprisonment. Pursuant to U.S.S.G. § 4A1.2(e), this conviction results in no criminal history points because it was imposed more than ten years prior to the defendant's commencement of the instant offense.

9.  On or about August 11, 2003, the defendant was convicted in New York County Criminal Court for criminal sale of marijuana, in violation of N.Y.P.L. § 221.35, a misdemeanor, and was sentenced to 4 months' imprisonment. Pursuant to U.S.S.G. § 4A1.2(e), this conviction results in no criminal history points because it was imposed more than ten years prior to the defendant's commencement of the instant offense.

10. On or about January 16, 2003, the defendant was convicted in New York County Criminal Court for two counts of fraudulent accosting, in violation of N.Y.P.L. § 165.30, a misdemeanor, and was sentenced to 10 days' imprisonment and a conditional discharge, respectively. Pursuant to U.S.S.G. § 4A1.2(e), these convictions result in no

criminal history points because they were imposed more than ten years prior to the defendant's commencement of the instant offense.

In accordance with the foregoing, the defendant's Criminal History Category is III.

C. Sentencing Range

Based upon the calculations set forth above, the defendant's sentencing range would be 168 to 210 months' imprisonment. However, because the statutory maximum for Count One is 120 months' imprisonment, the defendant's sentencing range is 120 months' imprisonment. In addition, after determining the defendant's ability to pay, the Court may impose a fine pursuant to U.S.S.G. § 5E1.2. At offense level 33, the applicable fine range is $35,000 to $350,000.

The foregoing Guidelines calculation is based on facts and information currently known to the Office. Nothing in this letter limits the right of this Office (1) to change its position at any time as to the appropriate Guidelines calculation in this case, even if that change is based, in whole or in part, on information that was in the Government's possession as of the date of this letter; and/or (2) to present to the Court or the United States Probation Office, either orally or in writing, any and all facts and arguments relevant to sentencing that are available to the Office at the time of sentencing. Nor does anything in this letter limit the right of this Office to seek a departure under or variance from the Guidelines, or to take a position on any departure or variance that may be suggested by the Court, the United States Probation Office, or the defendant.

This letter does not and cannot bind either the Court or the United States Probation Office, either as to questions of fact or as to determinations of the correct application of the Guidelines in this case. Instead, the sentence to be imposed upon the defendant will be determined solely by the Court. This Office cannot and does not make any promise or representation as to what sentence the defendant will receive.

The defendant recognizes that, if he is not a citizen of the United States, his guilty plea and conviction make it very likely that his deportation from the United States is presumptively mandatory and that, at a minimum, he is at risk of being deported or suffering other adverse immigration consequences. The defendant is entitled to and should seek advice from his counsel on this issue.

Very truly yours,

DAMIAN WILLIAMS
United States Attorney


By: ___/s/ Mathew Andrews_____
     Mathew Andrews
     Assistant United States Attorney
     (212) 637-6526

# EXHIBIT B

The Honorable Lewis J. Liman
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

Re: *United States v* Moorishyu *Bey,* 22 CR 132

Judge Liman,

I am Siraj Bey. I send this letter on behalf of Moorishyu Bey. I haven't known him forever but in the time that we have gotten to know each other I came to know a few things about him and his character. I will first start off by saying he was a single parent taking care of his daughter. He would alternate between his son and daughter at times and showed a lot of patience in dealing with his children. No matter what he was dealing with when it came to his children he would put everything on the back burner to be there for them. I could see how his long term absence might impact them.

Moorishyu is also a teacher/ leader in the Moorish Community. He has led hundreds of people to the temples he had become a part of. When we met, we would get together to study a few times a week. Although he was dealing with some heavy things at the time he was still doing a remarkable job in our community. Many people still seek him out to be educated in our community as well. He has always shown himself to be a provider and protector of those close to him. Moorishyu is a very kind, soft spoken person and he has a big heart. The things I have come to know that are important to him are family, education, health and growth.

I also found out that he has cancer in the time that we were studying. That is something that really bothers everyone that knows about it because these days cancer is not anything to play with. Everyone I know has had someone they love die from cancer due to the type of treatment or how late it was started. I pray to Allah that he gets the right type of treatment there so that his children get to see him again. Also that when they do see him he is not unrecognizable or that they at least remember him as he was.

Moorishyu has opened up to me about his childhood and we shared some experiences that we both went through as children at the hands of loved ones. I can say that for an individual with those types of demons to battle, he has persevered tremendously emotionally and spiritually. He has done his best to be the father he didn't get to experience and been the protector from a toxic family dynamic and his absence is duly felt in the community and from his children. We are devastated without him now and would be devastated to lose him for good.

Our community sends him support, respect and love. I send this letter on his behalf and affirm that I have spoken my truth regarding Moorishyu Bey and knowledge of his personality. I ask that you take this into account when you read about him and make your final decision. Knowing that you have many elements to go over I won't keep you away from that much longer. With peace and love in my heart I now close this letter out in great faith.


Sincerely,

Siraj Bey